Filed 9/30/15  P. v. Storey CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D065025 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD240241) |
| DONTAZE A. STOREY, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant of 19 counts of sexually abusing two of his daughters (V.S. and I.S.) when they were minors (Pen. Code, § 288, subd. (a)),[1] and two counts of failing to register as a sex offender based on prior convictions for sexually abusing another daughter (E.S.) (§§ 290.013, subds. (a)-(b), 290.018, subd. (b)).  The jury deadlocked on four counts based on defendant's alleged sexual abuse of a fourth daughter (K.S.).  The trial court sentenced defendant to an indeterminate term of 185 years to life, and a consecutive determinate term of 40 years.  On appeal, defendant asserts the trial court erred by (1) limiting his ability to rebut the prosecution's introduction of his prior convictions as propensity evidence under Evidence Code section 1108; (2) instructing the jury, in the context of evaluating a defense expert's opinions, not to consider I.S.'s pretrial forensic interviews for their truth, even though the interviews were separately admitted for their truth under an applicable hearsay exception; and (3) resolving a factual dispute regarding the trigger date for an extended statute of limitations applicable to defendant's sexual abuse of V.S. in 1988.  For reasons we shall explain, we reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 1995, defendant was convicted of three counts of committing lewd acts on his daughter, E.S., between June 1992 and June 1993, when she was between three and four years old.  The court sentenced defendant to 10 years in prison.  He was released in 2000.

_____

1   Unspecified statutory references are to the Penal Code.

2

In 2012, defendant was charged with 23 counts of sexually abusing three of his other daughters. Seventeen of those counts arose from defendant's sexual abuse of his daughter V.S. in 1988, when she was 13; two arose from his sexual abuse of his daughter I.S. between 2004 and 2011, when she was seven or younger; and four arose from his alleged sexual abuse of his daughter K.S. between 2006 and 2011, when she was five or younger.

*Defendant's Sexual Abuse of V.S. in 1988 (Counts 7 through 23)*

Defendant's daughter, V.S., was born in 1974. Her mother left with her when she was six months old, so V.S. first met defendant at age 11 and they began a father-daughter relationship. During a visit to his home when V.S. was around 11 or 12 years old, defendant tried to touch her vaginal area while she was falling asleep on the couch. V.S. was shocked and moved away, but neither said anything. They continued to have a father-daughter relationship, and there was no further inappropriate touching until V.S. was 13.

V.S.'s mother suffered from mental health issues and was physically and verbally abusive to her. When V.S. was 13, her mother threw a glass mayonnaise jar at her head, but missed. This prompted V.S. to move in with defendant and his then-wife, Esther, who was pregnant with defendant's daughter, E.S.

Defendant began sexually abusing V.S. as soon as she moved in. The first incident occurred when defendant touched V.S.'s vagina while she was sleeping in her bed. V.S. told him it made her angry, but defendant responded, "You're not angry

3

because I'm touching you. You're angry because you like it." This confused and shamed V.S.

After the first incident, defendant continuously abused V.S. in his work van. Every day, he touched V.S.'s vagina and performed oral sex on her.[2] Defendant had V.S. perform oral sex on him a few times. They drank beer and smoked marijuana together.

When V.S. turned 14, defendant's abuse of her escalated to daily sexual intercourse.

Esther noticed unusual behavior between defendant and V.S. One night she found defendant kneeling over V.S.'s bed while he was wearing only bikini brief underwear. Esther also saw V.S. sit on defendant's lap while one or both of them were in their underwear. Defendant told Esther he thought a father should "have" his girls before they married or had relationships with anyone else. In early 1989, defendant and Esther separated.

After the separation, V.S. lived with defendant in various locations. When they lived with defendant's girlfriend, Karen Spearman, she noticed inappropriate behavior. Defendant and V.S. walked around naked in front of each other. On one occasion, defendant entered the bathroom naked while V.S. was showering and shut the door. Another time, when Spearman came home and found defendant and V.S. naked, defendant explained he was cuddling V.S. in bed.

---

[2]    Defendant performed oral sex on V.S. in the van during a recess in custody proceedings with V.S.'s mother and almost missed the hearing. He was awarded custody of V.S.

4

Later, when defendant and V.S. no longer lived with Spearman, defendant's then 16- or 17-year-old niece stayed with them for about six months. V.S. and the niece shared a bedroom, but V.S. slept in defendant's room every night. The niece walked in on defendant and V.S. having sex one morning. Defendant offered the niece money to have sex with him, but she declined and promptly moved out.

Defendant's sexual relationship with V.S. continued until she was 20 years old. It ended in 1995 when defendant was convicted of sexually abusing E.S. and became incarcerated.[3] Defendant tried to resume a sexual relationship with V.S. when he was released from prison in 2000, but V.S. refused.

V.S. never told anybody about defendant's sexual abuse while it was happening. Defendant told her that if she ever told anyone, he would deny it and then she would have no one to look out for her or love her. It was not until 2005, when V.S. watched an episode of *Oprah*, that she realized how wrong defendant's conduct was. V.S. became worried for defendant's other daughters, so she called child protective services (CPS). CPS was unable to take action because V.S. did not know defendant's whereabouts.

In 2011, V.S. learned defendant stood accused of sexually abusing two of his other daughters, I.S. and K.S.[4] To support those claims, V.S. wrote a letter to the court

---

[3]  During the 1995 trial, V.S. denied that defendant ever sexually abused her. She later explained she was lying then because she was ashamed and would have nowhere to go if defendant were taken away from her.

[4]  We discuss defendant's abuse of I.S. below. However, because the jury deadlocked on the counts relating to K.S. and there are no issues regarding K.S. raised in this appeal, we do not discuss defendant's alleged sexual abuse of her.

regarding defendant's abuse of her. The police received the letter and contacted V.S. In November 2011, V.S. met with Detective Daniel Burow and gave a detailed statement of defendant's abuse of her from the age of 13 forward. She later said defendant video recorded some of their sexual encounters and that she buried the videotapes when defendant went to prison in 1995. She led police to the videotapes. A clip from one was played for the jury, and V.S. testified it depicted defendant having sex with her.

*Defendant's Sexual Abuse of I.S. (Counts 5 and 6)*

Defendant met C.S. in 2000 and married her a few years later. In December 2004, C.S. gave birth to defendant's daughter, I.S. I.S. is developmentally delayed and has difficulty processing information. In October 2006, C.S. gave birth to another of defendant's daughters, K.S. K.S. is developmentally delayed and physically disabled.

In August 2011, I.S. told C.S. she had put a heart-shaped rock in her vagina. C.S. took I.S. to the children's hospital, where a pediatric surgeon removed the rock.

A few weeks later, I.S.'s maternal aunt talked to I.S. at a family birthday party. Regarding the rock, I.S. told her aunt, " 'My daddy did it.' " I.S. also wanted her aunt to "[s]tay in [I.S.'s] room with [her] at nighttime, because [her] dad comes in at nighttime." Later, I.S. told her aunt she was scared because defendant "touches [her]" and "put tape on [her] mouth and rubbed [her] leg." The aunt called CPS.

In October 2011, CPS alerted the police, who, in turn, scheduled an examination of I.S. Dr. Joyce Adams, a specialist in pediatric sexual abuse cases, examined I.S. Adams found multiple healed tears in I.S.'s hymen, as well as a genital wart. This suggested sexual abuse.

6

I.S. underwent a four-part forensic interview with Laurie Fortin, a licensed clinical social worker who specializes in child sexual abuse. During the interviews, I.S. denied defendant touched her inappropriately. However, at the preliminary hearing, I.S. testified defendant "touched her private part with his private part."

I.S. testified at trial that defendant repeatedly touched her vagina with his penis. He told her not to tell anyone, and she feared that if she did she would end up in foster care or defendant would whip her (he whipped her with a belt when she wet the bed).

*Defendant's Failure To Register as a Sex Offender*

As a result of his 1995 convictions for sexually abusing E.S., defendant was required to register annually with law enforcement within five working days of his birthday or upon a change of residence. (§§ 290, 290.012, 290.013.) In April 2011, defendant timely registered his address as the apartment he shared with C.S., I.S., and K.S. Defendant stopped living in that apartment in October 2011, and began living in space belonging to the Association of Black Contractors in late 2011 or early 2012. As of April 2012, defendant had not notified law enforcement of his change in residence.

*Jury Verdict and Sentencing*

Defendant was charged with 23 counts of committing a lewd or lascivious act on his minor daughters (§ 288, subd. (a)) and two counts of failing to register as a sex offender (§§ 290.013, subds. (a)-(b), 290.018, subd. (b)). Counts 1 through 4 related to defendant's alleged sexual abuse of K.S.; counts 5 and 6 related to his sexual abuse of I.S.; counts 7 through 23 related to his sexual abuse of V.S. in 1988; and counts 24 and 25 related to his failure to register as a sex offender.

7

As to counts 1 through 6, the information specially alleged that defendant was previously convicted of violating section 288, subdivision (a) (§ 667.61, subds. (a), (c) & (d)), that there were multiple victims (§ 667.61, subds. (b), (c) & (e)), and that defendant engaged in substantial sexual conduct with the victims (§ 1203.066, subd. (a)(8)). The information further alleged that counts 7 through 23 were timely filed. (§ 803, subd. (f)). Finally, the information alleged defendant had three prior serious felony convictions (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) and three prior strike convictions (§§ 667, subds. (b)-(i), 668, 1170.12).

The jury deadlocked on counts 1 through 4, but returned guilty verdicts on all the remaining counts and found true the associated special allegations. Defendant admitted the prior conviction allegations were true. The trial court sentenced defendant to an indeterminate term of 185 years to life, and a consecutive determinate term of 40 years.

## DISCUSSION

## I.

### *EXCLUSION OF EVIDENCE TO REBUT PROPENSITY EVIDENCE*

The trial court allowed the prosecutor to admit defendant's 1995 convictions for sexually abusing E.S. as propensity evidence under Evidence Code section 1108, subdivision (a).[5] Defendant sought to rebut this evidence with "evidence and testimony

---

5    Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

8

through CPS, a city attorney and [V.S.] that [E.S.] [subsequently] told them she was not molested and her grandmother planted and suggested the accusations of molest." The trial court barred defendant's evidence. Defendant concedes his prior conviction was properly admitted as propensity evidence, but contends the trial court's exclusion of his rebuttal evidence violated his Fifth, Sixth, and Fourteenth Amendment rights to compulsory process, cross-examination, and due process. We are not persuaded.

*A.* *Proceedings Below*

Before trial, the prosecutor identified certain propensity evidence she intended to introduce at trial. That evidence included defendant's 1995 convictions for sexually abusing E.S. The prosecutor explained that as a matter of efficiency, she planned to introduce just the certified convictions without any live testimony from witnesses about the circumstances of the convictions.

Defense counsel opposed this approach. She acknowledged "the certified records of conviction would certainly show [E.S.] was molested," but argued E.S. later admitted to others she was coerced into falsely saying defendant had sexually abused her. Therefore, defense counsel argued that if the convictions were admitted, she should be able to "impeach" them. However, because she could not locate E.S., she indicated she would impeach the conviction with the testimony of those to whom E.S. supposedly recanted, even though counsel acknowledged "[i]t's not quite proper with me attacking the conviction with hearsay . . . ." Defense counsel acknowledged her approach would require "a trial within a trial" that would consume "at least" two weeks of trial time.

9

The trial court ruled the convictions were admissible and found that defendant's purported impeachment evidence was irrelevant because it would not change the fact of the fully litigated convictions. The trial court further excluded defendant's evidence as unduly time-consuming under Evidence Code section 352.[6] Nevertheless, if defendant were to testify at trial, the trial court would allow him to deny that he sexually abused E.S. and to claim that she was lying about having been sexually abused.

Defendant later renewed his request to attack the convictions with hearsay testimony that E.S. denied she was sexually abused. The trial court confirmed its prior ruling, declining to "hav[e] a little mini Jerry Springer Show" that explored the family dynamics that might have led E.S. to tell different versions of her story to different people at different times. The court clarified it would allow defendant to also oppose the propensity evidence with testimony of "somebody of a similar age" of his victims who would state "I was with him during whatever the time period is, and he didn't try to molest me."

The impeachment issue arose during trial. On cross-examination, defense counsel asked V.S. why, during defendant's prosecution for sexually abusing E.S., V.S. supposedly lied by denying defendant had sexually abused her. The following exchange occurred:

"A. I really did not believe he molested my sister."

_____

6      Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

10

"Q. You never saw anything that led you to believe that he did?"

"A. No. And I did not want him to get in trouble for molesting my sister because I did—really I did not believe he molested her."

V.S. then testified that she, E.S., and defendant "would hang out together" after defendant was released from prison.

On recross-examination, defense counsel tried to explore V.S.'s basis for believing defendant's claim he had not sexually abused E.S.

"Q. Counsel asked you whether or not my client said things to you about [E.S.], and you believed them."

"A. During the time of the trial, about what was going on for the molestation of [E.S.], yes. I believed him."

"Q. And there are statements that [E.S.] made to you also that were consistent with what my client told you, correct?"

"[Prosecutor]: Objection, hearsay."

"The Court: Sustained."

"[Defense counsel]: There were reasons for you to believe what my client said relating to [E.S.], true?"

"A. During the trial of him molesting her?"

"Q. During and after."

"[Prosecutor]: Objection, speculation, relevance."

"The Court: Sustained."

"[Defense counsel]: You mentioned that there were statements that caused you—that my client made that you believed regarding the molestation of [E.S.], correct?"

"A. Yes."

11

"Q.      There were other reasons for you to believe what he had said to you, true?"

"A.      Yes."

"Q.      Those reasons came from [E.S.]; isn't that true?"

"[Prosecutor]:    Objection, speculation."

"The Court:      Sustained."

"[Defense counsel]:      Your honor, may we go sidebar?"

"The Court:      No.  Ask another question."

"[Defense counsel]:      There were reasons outside of what my client told you that caused you to believe him; isn't that correct?"

"A.      During the case of the molestation of [E.S.], yes."

"Q.      And after, correct?"

"A.      And that—be specific of after."

"Q.      After he—well, we will say while he was in prison and after he got out of prison there were things that were said to you that caused you to continue to believe what my client had told you, correct?"

"[Prosecutor]:    Objection, hearsay."

"[Defense counsel]:      I'm not asking for what was said."

"The Court:      Overruled.  Her state of mind.  Yes or no, after he got out of prison?"

"The witness:    He got out of prison for a period of time, yes."

"The Court:      Okay.  Ask another question."

"[Defense counsel]:      And those things that you heard did not come from my client.  They came from other people, correct?"

"[Prosecutor]:    Objection, hearsay, speculation."

"The Court:      Sustained.  [¶]  Ask another question."

12

"[Defense Counsel]:     It came from—"

"The Court:     Let's go on—you can't ask that question, so let's go on to another topic, please."

"[Defense counsel]:     I have nothing further."

Defense counsel argued that V.S.'s testimony had opened the door for her to ask about E.S.'s hearsay statements. The trial court disagreed and reaffirmed its earlier ruling.

Before defendant took the witness stand, his counsel again raised the impeachment issue. The trial court reaffirmed its ruling under Evidence Code section 352, but reiterated that defendant could deny that he sexually abused E.S. and clarified that defendant could also argue E.S. would not have lived with him again (as she did) had defendant truly sexually abused her.

Defendant testified he did not molest E.S. or his other daughters. When defendant's counsel asked him the circumstances under which E.S. came back into his life after he served his prison sentence for sexually abusing her, defendant responded, "[E.S.] confessed to me that she knew I had not—" The trial court sustained the prosecutor's hearsay objection. When defendant's counsel asked him why he let E.S. move in with him, he responded, "Because she had—because she had confessed that she knew I didn't—" The trial court again sustained the prosecutor's hearsay objection.

During closing argument, defense counsel argued V.S. knew defendant had not sexually abused E.S. and would not have allowed her to live near defendant if he had. Counsel elaborated:

13

"When [V.S.] was on the stand, ladies and gentlemen, it was very interesting to watch. She was asked questions whether or not my client had said something to her that caused her to believe him. She answered yes. And then I started asking her questions whether or not there was anything else, anything independent that caused her to believe him. There's a flurry of objections. But it comes out. There was something independent that caused her to believe him.

"And what was that one thing? Couldn't go there. The one thing independent was the fact that [E.S.], after she was 13 years old and her mother had abused her—her grandmother had abused her for so long and she ran away from home, she came to him and she confessed to him exactly what had happened, that her grandmother had forced her to say that he abused her for financial gain."

"[Prosecutor]:    Objection."

"The Court:    Sustained."

"[Prosecutor]:    Motion to strike that entire argument."

"The Court:    Right. Strike that."

"[Prosecutor]:    No evidence of that."

"The Court:    Disregard that."

"[Defense counsel]:    A reasonable interpretation as to why [V.S.] and [E.S.] came back into his life, because he didn't do it."

Later, during closing argument, defense counsel argued, without objection, "Why would this man bring in his daughter that he molested, who actually sent him to prison in 1995, into his home if he was molesting his children? . . . A reasonable interpretation as to why he would let [E.S.] come back into his home is because she confessed to him nothing happened and he said, I forgive you."

B.    *Relevant Law*

Evidence Code section 1108 sets forth an exception to the general rule against the use of evidence of a defendant's misconduct apart from the charged offense to show a

14

propensity to commit crimes. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 989-990.) When a defendant is charged with a sex offense, Evidence Code section 1108 allows admission of evidence of other sex offenses to prove the defendant's disposition to commit sex offenses, subject to the trial court's discretion to exclude the evidence under Evidence Code section 352. (Evid. Code, § 1108, subd. (a); *Robertson*, at p. 990.) Evidence Code section 1108 is premised on the recognition that sex offense propensity evidence is critical in sex offense cases " 'given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' " (*People v. Falsetta* (1999) 21 Cal.4th 903, 918.)

Under Evidence Code section 1108, the prosecution must prove only by a preponderance of the evidence that the defendant committed a prior sexual offense. (*People v. Lopez* (2007) 156 Cal.App.4th 1291, 1299.) Court records of the defendant's prior conviction for a sex offense "may be offered to prove not only the fact of a conviction, but the commission of the underlying offense." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1461; see *People v. Wesson* (2006) 138 Cal.App.4th 959, 967-968; Evid. Code, § 452.5, subd. (b)(1) ["An official record of conviction . . . is admissible . . . to prove the commission . . . of a criminal offense . . . ."].)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a

showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Id*. at pp. 1124-1125.)

"[A] state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon" a defendant's "general right to offer a defense through the testimony of his or her witnesses." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 ["Although completely excluding evidence of an accused's defense theoretically could rise to [the level of impermissibly infringing on a defendant's right to present a defense], excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense."].)

C.      *Analysis*

The trial court did not abuse its discretion by excluding defendant's rebuttal evidence as unduly time-consuming under Evidence Code section 352.  Defense counsel conceded her impeachment approach would result in not only one tremendous "trial within a trial"—"[a]t least" two weeks "just on [E.S.]"—but would actually result in *two*: "rehashing the entire trial, *plus* what happened after."  (Italics added.)

The prosecution agreed that if defendant sought to impeach E.S.'s 1995 trial testimony, the prosecution would be forced to retry the entire case by presenting all the

evidence in addition to E.S.'s trial testimony.[7] Defense counsel acknowledged the 1995 trial was "voluminous" and lasted "probably about a week and a half."

Defense counsel and the prosecutor agreed the second mini-trial—addressing E.S.'s supposed subsequent recantations and the circumstances surrounding them—would also be extensive. Defense counsel stated, "I would have a list of witnesses that would come in to impeach [E.S.] or impeach whatever in that trial. You're looking at two weeks just on [E.S.]. At least." She elaborated that the "can of worms that is being opened" would contain a lawsuit that defendant filed against E.S. over an unpaid phone bill and an elder abuse complaint E.S.'s grandmother filed against her. The prosecutor identified additional "worms": that one of E.S.'s "recantations"[8] occurred after she was visiting with defendant while he was on parole and subject to a "no-contact-with-children order"; that defendant violated parole and was sent back to prison three times; that defendant was charged with misdemeanor battery for "beat[ing] [E.S.] up while she was pregnant"; that E.S. was financially dependent on defendant; and that E.S. was concerned her mother would be left without support if defendant returned to prison.

---

[7]     The prosecutor argued: "[I]f the jury is left to believe that [E.S.] was the reason for that prior conviction, the jury will need to learn that there was much more behind that conviction. There were her spontaneous disclosures, there was her forensic interview when she was [four] years old giving the details, there were her physical findings. All of that evidence would then need to be presented to the jury. This will turn into a trial within a trial within a trial, which . . . is just going to be confusing."

[8]     According to the prosecutor, E.S. did not deny defendant had abused her, but rather, said she did not remember if he had.

17

The current trial consisted of eight court days of argument and testimony. The trial court did not abuse its discretion by declining to permit a full-blown trial on an ancillary impeachment issue that would have more than doubled the length of trial.

Further, the trial court's ruling did not, as defendant asserts, "deprive[] . . . defendant of *all* evidence concerning the theory of defense." Instead, the court's evidentiary ruling was limited to certain evidence intended to rebut a single item of propensity evidence. The court's ruling did not preclude defendant from defending against the merits of the prosecution's pending case. And even as to the narrow issue of propensity evidence, the court ruled defendant could (1) deny he sexually abused E.S.; (2) accuse her of lying about it; (3) argue that her living with him later undermined her claim; and (4) present character evidence that he did not molest other children when presented with similar opportunities. The record shows defendant did, in fact, (1) deny he sexually abused E.S.; (2) elicit from V.S. that she believed defendant when he said he did not molest E.S. and that "there were things that were said" to her that caused her to believe that; and (3) argue in closing that "[a] reasonable interpretation as to why [defendant] would let [E.S.] come back into his home is because she confessed to him nothing happened . . . ." Defendant was not completely deprived of an opportunity to present an adequate defense.

Defendant's only argument on appeal regarding undue consumption of time is that "the more extensive and time consuming the evidence that [defendant] did not molest [E.S.] the greater the importance of the evidence to [his] defense." We reject this

18

reasoning as circular—it would effectively read the undue-consumption-of-time element out of Evidence Code section 352.

Finally, none of defendant's cited cases support his argument that the trial court was required to admit his impeachment evidence. *People v. Cottone* (2013) 57 Cal.4th 269 is distinguishable because it involved *uncharged* prior conduct and addressed whether the defendant's maturity was a relevant factor in evaluating whether he had a propensity to commit sexual offenses. (*Id.* at pp. 278, 290.) Here, defendant was *charged* with sexually abusing E.S. and his maturity was not at issue. *People v. Griffin* (1967) 66 Cal.2d 459, 465 and *People v. Mullens* (2004) 119 Cal.App.4th 648, 662-663 are distinguishable because the trial courts admitted evidence of charged prior sexual offenses but excluded evidence that the defendants had been *acquitted* of those charges. By contrast, defendant was *convicted* of sexually abusing E.S. *People v. Callahan* (1999) 74 Cal.App.4th 356 is unpersuasive because that court "conclude[d] that when the prosecution introduces evidence under [Evidence Code] section 1108 of the defendant's commission of another sexual offense or offenses, the defendant is not precluded from introducing evidence of specific instances of his good behavior under similar circumstances." (*Id.* at p. 360.) Here, the trial court ruled defendant could do precisely that.

On this record, we find no abuse of discretion in the trial court's exclusion of admittedly time-consuming evidence aimed at impeaching E.S.'s testimony during the trial that led to defendant's 1995 conviction.

19

## II.

### *JURY INSTRUCTIONS REGARDING I.S.'S FORENSIC INTERVIEWS*

Defendant contends the trial court committed reversible error by instructing the jury not to consider for their truth I.S.'s statements during pretrial forensic interviews that defendant did not sexually abuse her. The People concede this instruction was erroneous, but assert it was harmless in light of the record and overall charge to the jury. We agree.

### A.    *Proceedings Below*

At trial, recordings of four forensic interviews of I.S. were played for the jury without objection. The parties appear to have agreed they were admissible as prior inconsistent statements. (Evid. Code, § 1235.) Although I.S. testified at trial that defendant sexually abused her, in the interviews she denied any sexual abuse occurred.

Clinical and forensic psychologist Joanna Edwards testified on defendant's behalf regarding children's "suggestibility" during interviews. Edwards considered I.S.'s earlier denials when assessing the reliability of her later testimony.

Even though counsel agreed I.S.'s forensic interviews had not been admitted for a limited purpose (that is, they were admitted for their truth), the trial court instructed the jury to the contrary with CALCRIM No. 360:

> "Dr. Joanna Edwards testified that in reaching her conclusions as an expert witness, she considered statements made by [I.S.] and [K.S.]. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements [is] true."

The court also instructed the jury with CALCRIM No. 318:

"You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways:

"To evaluate whether the witness's testimony in court is believable;

"AND

"As evidence that the information in those earlier statements is true."

In closing argument, defense counsel repeatedly encouraged the jury to believe I.S.'s statements during her forensic interviews over her trial testimony:

> "Let's talk about [I.S.]. The district attorney didn't want you to see the real [I.S.] back in 2011 when she's eating Play-Doh® during the break. It's sad, but the reality is that [I.S.] has a delay that not just prevents her from being able to speak her mind, but being able to perceive events, hear them, and then say them back. [I.S.] had been interviewed numerous times and denied that there was any touching. And in four interviews, she denied that my client had done anything wrong to her. Go back and look at those interviews, because what's interesting is that no matter how many times she denies, she's not getting out of that room. Laurie Fortin wants to keep going until she admits, which is why Laurie Fortin keeps going."
>
> [¶] . . . [¶]
>
> "So, [I.S.] denies any touching, comes in as if she had no delay, as if there was nothing wrong with her ability to perceive events. In August of 2012, the first question she's asked [during the preliminary hearing] is, do you know why you are here today? She said, yes, my daddy did touching to my private parts. Wow. You saw her in that video. How did she change from those videos to that if it wasn't coaching over the years?"

During deliberations, the jury requested the video of K.S.'s (but not I.S.'s) forensic interview. The request was granted without objection. Although the jury requested several witnesses' trial transcripts, Edwards's was not among them.

*B.*     *Relevant Law*

We review de novo the propriety of jury instructions.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  "In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' "  (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 (*Hajek*); see generally *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)[9]  " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' "  (*Hajek, supra*, at p. 1220.)  " '[W]e must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given."  (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)  " 'Moreover, any theoretical possibility of confusion [may be] diminished by the parties' closing arguments . . . .' "  (*Hajek*, at p. 1220, brackets in original.)  " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' "  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

*C.*     *Analysis*

Accepting the People's concession that the trial court erred by instructing the jury with CALCRIM No. 360 in light of the admission of I.S.'s forensic interviews under a

---

[9]     We reject defendant's suggestion that we should assess prejudice under the federal constitutional standard of harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)  Contrary to defendant's view, the error did not impact his right to present a complete defense under the Fifth and Sixth Amendments, or to due process under the Fourteenth Amendment.  Defendant's reliance on *Gonzales v. Lytle* (10th Cir. 1999) 167 F.3d 1318 is misplaced.  There, the jury was precluded *entirely* from hearing a witness's inconsistent statement.  Here, the jury heard all of I.S.'s forensic interviews.

22

hearsay exception, we conclude the error was harmless.[10]  Although CALCRIM No. 360 instructed jurors they could not consider I.S.'s forensic interviews for their truth *when evaluating Edwards's opinions*, CALCRIM No. 318 instructed jurors they *could* consider them for their truth, *generally*.

"[A]ny theoretical possibility of confusion" (*Hajek, supra*, 58 Cal.4th at p. 1220) was eliminated by defense counsel's encouragement to jurors that they "[g]o back and look at those interviews" when evaluating the veracity of I.S.'s testimony.  The encouragement was wholly unrelated to the validity of Edwards's opinions.  That any confusion is merely theoretical is borne out by the jury's request for K.S.'s forensic interview and not Edwards's trial testimony—jurors would not have requested K.S.'s interview alone if they did not believe they could consider it independently from Edwards's opinions.  Moreover, the fact that the jury deadlocked on the counts relating to K.S.—despite her trial testimony that defendant never sexually abused her—suggests the jurors who were willing to convict defendant on those counts considered K.S.'s statements during her forensic interviews for their truth.

Defendant cites *People v. Clark* (2011) 52 Cal.4th 856 (*Clark*) to support the proposition that CALCRIM No. 360 "would interfere with defense attempts to use the statements relied upon by an expert for their truth."  *Clark* is inapposite.  There, the Supreme Court—after finding the defendant forfeited the issue—rejected the defendant's

---

[10]    The bench notes accompanying CALCRIM No. 360 state:  "This instruction should not be given if all of the statements relied on by the expert were admitted under applicable hearsay exceptions."

23

claim that the trial court erred by *not instructing* with CALCRIM No. 360's predecessor, CALJIC No. 2.10. (*Clark*, at p. 942.) Here, defendant asserts the trial court erred by *instructing* with CALCRIM No. 360. The *Clark* court's speculation about what "might have" happened had the court instructed the jury with CALJIC No. 2.10 is not instructive here. (*Clark*, at p. 942.)

On this record, we conclude there is no reasonable likelihood the jury believed it could not consider I.S.'s forensic interviews for their truth. Thus, any instructional error was harmless.

## III.

### *STATUTE OF LIMITATIONS*

The statute of limitations for a violation of section 288, subdivision (a) is normally six years. (§ 800; *People v. Smith* (2011) 198 Cal.App.4th 415, 424 (*Smith*).) If it has expired, it may be reopened for a one-year period beginning when the victim first reports to a law enforcement agency the commission of a crime involving substantial sexual conduct. (§ 803, subd. (f)(1), (2)(B); *Smith*, at p. 424.) Defendant asserts V.S. first reported the crimes committed against her to law enforcement in 2005, while the People assert she first reported them in 2011.[11] Because prosecution commenced in 2012, the timeliness of counts 7 through 23 (defendant's sexual abuse of V.S. in 1988) depends on when the extended statute of limitations was triggered. Defendant contends the trial court

---

[11]    The People acknowledge a 2005 report to CPS, but contend it was insufficient to trigger the extended statute of limitations because it was not to a law enforcement agency and did not disclose substantial sexual conduct.

improperly resolved this alleged factual dispute itself when it instructed the jury that the extended statute of limitations was triggered in 2011. We disagree.

*A.    Proceedings Below*

To establish the prosecution was timely, the prosecutor sought to show during V.S.'s direct examination that she first reported the details of defendant's sexual abuse of her to law enforcement in November 2011. V.S. testified she met with Detective Burow on November 28, 2011, and told him "[a]ll the incidents that happened when [she was] 13 years old in 1988[.]" When asked if this was her first disclosure to "law enforcement," V.S. initially stated she "called the police" after watching an episode of *Oprah* in 2005 to warn them defendant might molest his other daughters. V.S. later clarified the 2005 call was to CPS and that 2011 was the first time she disclosed the sexual abuse to police.

On cross-examination, defense counsel sought to establish the 2005 call was to law enforcement, not CPS. V.S. answered "[y]es" to leading questions that asked whether she "contacted the police department," "pick[ed] up a phone and contact[ed] a police officer," and had a "conversation . . . with the police officer about briefly what happened to [her.]"

On redirect examination, the prosecutor showed V.S. a report from CPS dated November 15, 2005. V.S. read the report and testified it refreshed her recollection that her 2005 call was to CPS and that her 2011 report to Detective Burow was her first report of the sexual abuse to law enforcement.[12]

---

12    "[Prosecutor:] You said it could have been police [you called], it could have been CPS. [¶] *Now that I've shown you that report*, here's the question: Did you, prior to

On recross-examination, V.S. again responded "[y]es" to leading questions that asked if she "contacted the police department" and "told the police department that [she] had been molested."

V.S. also testified regarding the extent of her disclosure in 2005. Initially, when asked if she "disclose[d] . . . in detail" in 2005 "all the details that [she] provided . . . in court," V.S. responded, "Probably. I don't remember." However, she later clarified that in 2005 she gave only a "general report" that she had been sexually abused; she "didn't give any details." V.S. testified repeatedly that her 2011 report to Detective Burow was "the first time [she] ever sat down with a police officer and provided all of those details about what happened to [her]." She acknowledged on re-redirect examination that "[i]n no uncertain terms did [she] ever report to any California law enforcement agency before November 28, 2011 specific acts of the defendant touching [her] vagina with his hand" or orally copulating her when she was 13. Defense counsel's questioning conceded V.S. did not disclose the details of her molestation in her 2005 report.[13]

_____

talking to Detective Burow in 2011, did you ever report to law enforcement what the defendant specifically did to you? [¶] [V.S.:] No. [¶] . . . [¶] [Prosecutor:] And just to be clear, *that report, those phone calls that you made, that would have been to CPS in San Diego*? [¶] [V.S.:] *Yes.* [¶] . . . [¶] [Prosecutor:] But just so we are clear. *The call that you remember specifically was to CPS*? [¶] [V.S.:] *Yes.* [¶] [Prosecutor:] And Detective Burow [was] the first law enforcement officer that you ever spoke with? [¶] [V.S.:] Yes." (Italics added.)

13      "[Defense Counsel:] I understand that *you didn't give all the details* that you have now given, but [did] you at least let law enforcement know that something had happened to you back in the days and you were concerned? [¶] [V.S.:] Yes. [¶] . . . [¶] [Defense Counsel:] It's fair to say that when you did contact the police department you did tell

Detective Burow testified he interviewed V.S. on November 28, 2011. V.S. reported to him that defendant touched her vagina with his hand, orally copulated her, and had her orally copulate him when she was 13. V.S. also told Burow this was her first report of the abuse to law enforcement. Burow verified this claim by reviewing a regional law enforcement database that contains records dating back seven to 10 years, and city-wide police records of child abuse reports that are retained for at least 10 years. Burow's review of the database and records did not reveal any prior report by V.S.

The prosecutor offered the following jury instruction regarding the extended statute of limitations' triggering date:

> "If you find the defendant guilty of a violation of Section 288(a) . . . as charged in Counts 7 thru 23, pursuant to Penal Code section 803[, subdivision] (f)(1), you must further decide whether the People have proved the following factual allegations by a preponderance of the evidence: [¶] (1) On April 11, 2012, a complaint was filed in this case, and on August 7, 2012, an amended complaint was filed in this case, *within a year of the victim's report of the crime to a California law enforcement agency on November 28, 2011*." (Italics added.)

Defense counsel objected and instead offered a general instruction on statute of limitations (CALCRIM No. 3410). The court used the prosecutor's instruction.

*B. Relevant Law*

"Ordinarily, the statute of limitations for a violation of section 288, subdivision (a) is six years under section 800." (*People v. Maguire* (2002) 102 Cal.App.4th 396, 399.) However, section 803, subdivision (f) "allows the prosecution to file an action after the

---

them that you were molested, but *you did not go into details*? [¶] [V.S.:] *That is correct*." (Italics added.)

27

expiration of the six-year statute when: (1) a victim of any age reports to a California law enforcement agency a violation that occurred while the victim was under age 18; (2) the crime involves 'substantial sexual conduct'; (3) independent evidence clearly and convincingly corroborates the victim's allegation; and (4) the criminal complaint is filed within one year of the date the report was made to law enforcement." (*Maguire*, at pp. 399-400 [discussing former section 803, subdivision (g)].) There are two significant nuances to these triggering criteria. First, the report must be made to a law enforcement agency; a report to CPS is insufficient. (*Maguire*, at pp. 399-400.) Second, the report "must refer to unlawful sexual abuse acts involving substantial sexual conduct"; a general report of sexual abuse is insufficient. (*People v. Superior Court (Maldonado)* (2007) 157 Cal.App.4th 694, 702.)

" 'Substantial sexual conduct' means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender," excluding "masturbation that is not mutual." (§§ 1203.066, subd. (b), 803, subd. (f)(2)(B).) This exclusion "refers to a defendant's self-masturbation in the presence of the victim." (*People v. Terry* (2005) 127 Cal.App.4th 750, 771 (*Terry*), citing *People v. Lamb* (1999) 76 Cal.App.4th 664, 679 (*Lamb*).) Therefore, a defendant's "acts in masturbating the victim fall within the definition of mutual masturbation." (*Lamb*, at p. 682; see *Terry*, at p. 771.)[14]

---

14    Defendant argued to the contrary in his reply brief, but withdrew the argument before oral argument.

Although the prosecution bears the burden of proving each element of an offense beyond a reasonable doubt, "the statute of limitations is not an ingredient of an offense but a substantive matter for which the prosecution's burden of proof is a preponderance of the evidence." (*People v. Riskin* (2006) 143 Cal.App.4th 234, 241.)

As discussed above, we review de novo the correctness of the trial court's instructions to the jury. (*People v. Posey, supra*, 32 Cal.4th at p. 218.) The trial court has no duty to give an instruction that is not supported by substantial evidence. (*People v. Moon* (2005) 37 Cal.4th 1, 30.) In this regard, substantial evidence is "evidence sufficient to 'deserve consideration by the jury,' not '. . . *any* evidence . . . presented, no matter how weak.' " (*People v. Williams* (1992) 4 Cal.4th 354, 361.)

C.      Analysis

The trial court did not err by instructing the jury that the extended statute of limitations was triggered in 2011 rather than 2005. First, no substantial evidence supports defendant's claim that V.S. reported sexual abuse to a *law enforcement agency* in 2005. Rather, the record is clear that V.S.'s 2005 report was to CPS. She so testified on direct examination. After defense counsel's cross-examination led V.S. to adopt references to "police" and "law enforcement," V.S. clarified on redirect—after reviewing the 2005 CPS report documenting her call—that her call was to CPS. V.S.'s affirmative responses to defense counsel's leading questions demonstrate only that V.S., as a lay witness, did not appreciate the significance of the legal distinction between CPS and a

law enforcement agency.[15]  Any doubt was resolved by Detective Burow's testimony that his search of law enforcement databases and records that date back to at least 2004—the year before V.S.'s 2005 report—did not reveal any report of sexual abuse by V.S. Thus, no substantial evidence would have supported a jury instruction premised on V.S.'s 2005 report having been made to a law enforcement agency.

Even if V.S.'s 2005 report had been to a law enforcement agency, it still would not have triggered the extended statute of limitations because V.S. did not report "substantial sexual conduct" (§ 1203.006, subd. (a)(8))—she gave only a "general report" that she had been sexually abused, without "giv[ing] any details."  V.S. testified consistently that, "[i]n no uncertain terms," her first report of the details of defendant's sexual abuse of her was to Detective Burow in 2011.  Defense counsel's questioning conceded as much. Thus, no substantial evidence would have supported a jury instruction premised on V.S. having reported substantial sexual conduct in 2005.

Because no substantial evidence would have supported a jury instruction premised on V.S.'s 2005 report having been made to a law enforcement agency or having disclosed substantial sexual conduct, the trial court did not err by instructing the jury that the extended statute of limitations was triggered in 2011 rather than 2005.

---

[15]    The prosecutor sought to clarify this distinction, stating within a broader question, "As lawyers we get used to what's a police department and CPS."  Defense counsel objected on hearsay and foundational grounds, and the trial court sustained the objection.

IV.

*CUMULATIVE ERROR*

Because we have found only one instance of harmless error with respect to the jury instructions regarding I.S.'s forensic interviews, we reject defendant's claim that cumulative error requires reversal of his convictions. (*People v. Bennett* (2009) 45 Cal.4th 577, 618 ["With the exception of a single erroneous evidentiary ruling, which was harmless beyond a reasonable doubt, we have rejected all other claims of error; thus there is no cumulative error."].)

DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


NARES, J.

31